**In re Petition for DISCIPLINARY ACTION AGAINST Dennis R. PETERSON, an Attorney at Law of the State of Minnesota.**

**No. C0–89–981.**

Supreme Court of Minnesota.

May 25, 1990.

William J. Wernz, Director of the Office of Lawyers Professional Responsibility, St. Paul, for appellant.

Jack S. Nordby, Meshbesher, Singer & Spence, Ltd., Minneapolis, for respondent.

PER CURIAM.

Following a 2–day hearing, Judge David E. Christensen, referee, found that respon-

dent Dennis R. Peterson had violated numerous Rules of Professional Conduct. The misconduct essentially grew out of respondent's involvement in a real estate development project. Respondent ordered a transcript, hence, the referee's findings and conclusions of law are not deemed conclusive but are subject to review.

### Borrowing minor's funds

Respondent obtained a net arbitration award of about $142,000 for his client, Michael, 20 years old, who had sustained serious head injuries in an auto accident. Although the arbitrators recommended that a conservatorship be established to administer Michael's money, respondent did not act on this recommendation; instead, he borrowed $100,000 of Michael's funds for Wimbledon Hills, Inc., a real estate development corporation. Respondent was president and a shareholder of the corporation and acted as its attorney.

Wimbledon Hills issued its note dated May 13, 1988, for $100,000 at 15 percent interest payable to Michael, executed by respondent as the corporation's president, and payable on demand. Respondent kept the note. The money for this loan to Wimbledon Hills was borrowed by Michael from First Bank. On the same day as the Wimbledon note, respondent had Michael borrow $100,000 on a note payable to First Bank due June 9, 1988; subsequently, this loan was extended by a similar note to the bank due December 6, 1988, which was signed by both Michael and respondent. The second note called for monthly interest payments. These notes to the bank were secured by a $100,000 certificate of deposit with the bank, which respondent had Michael purchase with funds from his personal injury recovery.

The referee found that respondent had not discussed these financial arrangements with Michael's parents, although he may at one time have mentioned to them Wimbledon Hills as a possible investment. The referee found that respondent did not disclose to Michael or his parents that respondent's own business interests conflicted with Michael's interests; that he was not acting on behalf of Michael; that the loan transaction was not reasonable because Wimbledon's note was neither secured nor guaranteed nor was the bank obligated to renew its note at maturity; and that at the time of these transactions Wimbledon Hills had a negative bank balance and was in financial difficulties.

Although Wimbledon Hills was paying large sums to various creditors, it did not pay the August and September interest payments on Michael's note to the bank. Michael's parents first learned of the transaction in December 1988 when they received a letter from the bank's attorney about the delinquent interest payments. Respondent suggested to Michael's father that Michael delay his demand for payment on the Wimbledon note for 6 months. Eventually, after Michael had retained an attorney and after the matter was reported to the Lawyers Board of Professional Responsibility, the Wimbledon note was paid. The attorney fees incurred by Michael in collecting on the note were left unpaid, although respondent now says he will pay them.

The referee found violations of Minnesota Rules of Professional Conduct, Rule 1.7(a) (direct adverse interest between two clients); Rule 1.7(b) (representation materially affected by responsibilities to others); Rule 1.8(a) (entering into business transactions with client); Rule 1.1 (competent representation); and Rule 8.4(d) (conduct prejudicial to the administration of justice). The violations are fully supported by the record.

Respondent argues he made a full disclosure and the arrangement was not unfair or unreasonable. We disagree. There was no meaningful disclosure, much less one in writing. Michael did not understand the transaction and did not even realize he was signing a note to pay back $100,000 to the bank. At the hearing, respondent seemed to justify his actions by stating the parents never disagreed with the investment, but it is clear he dealt unilaterally with Michael and never really discussed the investment with the boy's parents. Respondent claims that Michael did not have diminished capac-

ity and was not a vulnerable individual, but the record amply supports the referee's contrary findings. As Michael testified at the hearing, "[I]t's too bad that, you know, the lawyers happen to fall into the not trust category."

### Failure to provide information to the Director

The Director made four requests for financial documentation relating to Wimbledon Hills and respondent over a period of some 60 days. Respondent stalled the first two requests with inadequate information. He did not respond to the third request nor the fourth. When also asked to sign a release for the bank to turn over information to the Director, respondent modified the release by narrowing its scope.

■ Later, when deposed, respondent claimed he had been denied access to the requested documents by Louis Krall, another shareholder. Krall, however, testified this was not true.[1] The referee found that respondent "both legally and physically" could have produced the requested documents if he had chosen to do so. The evidence supports these findings. This constitutes a violation of Rule 8.1(a)(3) (failure to comply with demand for information); and Rule 8.4(d) (conduct prejudicial to the administration of justice).

### Overdrafts and false representations

Wimbledon Hills kept a checking account with First Bank Southeast at Rochester. On August 5, 1988, respondent, as president of Wimbledon, drew a $150,000 check on this account. The bank balance at the time was $961.28. Three days later, when the bank refused to honor the check, respondent covered by depositing three other checks. The bank then paid the $150,000 check drawn on the Wimbledon account only to learn some 10 days later that one of the three deposited checks for $50,000 had been returned unpaid.

On August 12, respondent telephoned a bank officer to say he was contemplating writing certain checks on the Wimbledon account in excess of funds on deposit. He told the bank officer that he was leaving for Europe that day but later that day he would have $400,000 deposited in the Wimbledon account to cover the checks he was writing. The bank honored respondent's checks, but no deposit to cover was made, and, as a result, the account was overdrawn. From August 18 to August 26 the account was overdrawn by over $100,000; thereafter and until January 1989, it was overdrawn some $63,000. The debt was not paid until the bank sued. The referee found that the representations made to the bank officer on August 12 were false. Respondent does not contend the overdrafts did not take place. He claimed that a deposit was to have been made on August 12 but he could not state who was to make it or from where the money was to be obtained. The evidence supports the referee's findings, and the misconduct is a violation of Rule 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation).

### False representations to contractor

On August 11, 1988, respondent wrote Fabricated Wood Products, Inc., a potential general contractor and supplier for the Wimbledon project. The letter stated Wimbledon had the necessary financing commitments to complete the project. The next day, respondent, as president of Wimbledon, signed a contract with Fabricated, calling for completion of the project by Fabricated "as quickly as possible" and committing Wimbledon to monthly payments totalling almost $1 million. In fact, Wimbledon did not have any financing commitments;

---

1. Krall testified by deposition and respondent contends the deposition was wrongfully admitted into evidence. Generally, he claims its admission violated his right to due process and confrontation and did not comply with Minn.R. Evid. 804(b)(1). We disagree. Disciplinary proceedings are *sui generis*. *In re Rerat*, 224 Minn. 124, 127, 28 N.W.2d 168, 172 (1947). Rule 14(b) of the Rules on Professional Responsibility provides that the Rules of Civil Procedure will be followed in disciplinary proceedings. Krall's deposition was duly noticed and taken. Respondent's counsel was present and cross-examined. At the hearing, Krall's unavailability to testify in person was established.

indeed, it had other contractual obligations aggregating over $1 million for which there was no evident source of payment.

Fabricated started work about August 12 but demanded written confirmation of the financial commitment. On August 18 respondent and Krall met with two First Bank officers who indicated a lack of interest in the project. Respondent took from the meeting a "working draft" of a pledge agreement that the bank had earlier drawn up at respondent's request. Under the draft agreement, the bank would provide a revolving line of credit if a $1 million certificate of deposit were pledged as security. Respondent had his secretary retype the draft agreement with some changes. For example, the words "working draft" were deleted, and a signature block for one of the bank officials was added to the last page. In his own handwriting and without authorization, respondent wrote the names of Krall and the bank official in the revised document and dated it August 18. A casual reading of the agreement would seem to suggest that Krall had deposited or would be depositing a $1 million certificate of deposit with the bank. Respondent then drafted a cover letter to Fabricated referring to the enclosed "Pledge Agreement which Wimbledon Hills has arranged," and adding, "I trust this document satisfies your questions and demonstrates to your satisfaction that Wimbledon Hills, Inc. has a $1 million for the sole purpose of paying construction costs of the units to be built by your company * * *." That same day the cover letter signed by respondent and the revised Pledge Agreement were delivered to Fabricated.

Fabricated became suspicious of the documents and on August 23 went to First Bank where they were informed that the agreement was not genuine, that the bank official's signature was not genuine, and that First Bank had no commitment to Wimbledon. When questioned about the document, respondent told the bank and Fabricated that his secretary had made a mistake. The referee found that respondent had intended to deceive the contractor into believing there was a $1 million bank commitment to the Wimbledon project, and

that the representations as to financing in the cover letter were false and were intended to deceive.

While it would seem that the Pledge Agreement and respondent's cover letter could not have deceived Fabricated for long, nor did it, the evidence is still clear and convincing that respondent made false representations with an intent to deceive. This is a violation of Rule 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation).

### Keller Construction

During negotiations with Austin P. Keller Construction Co., Inc., in June 1988, the referee found that respondent had falsely represented to Keller that Wimbledon Hills had obtained a commitment for sufficient construction financing. Keller then entered into a contract with Wimbledon to do certain work for $541,852. This was a further violation of Rule 8.4(c).

Through the summer and fall of 1988, Keller worked on the project but had problems collecting payment for its work on any consistent basis. In February 1989, Keller's attorney wrote respondent that unless certain payments were made by February 8, Keller would file a mechanic's lien for $54,389.56 against the project. Respondent, as attorney for Wimbledon Hills, promptly sought and obtained an ex parte temporary restraining order enjoining Keller from filing its lien. In support of the ex parte application, respondent stated in his affidavit that a bond existed that was more than adequate security to cover Keller's lien claims. A copy of the bond was attached to the affidavit. In fact, it was a performance bond running to the City of Rochester as obligee to assure a certain street in the development project would be constructed. The referee found there was no reasonable basis for respondent's representation that the bond protected Keller, and this finding, too, is supported by the evidence.

### Discipline to be imposed

The referee has recommended suspension for at least 3 years. The Di-

rector asks for disbarment. In determining the appropriate discipline, this court evaluates the nature of the misconduct, the cumulative weight of the violations, the potential harm to the public, and the harm to the legal profession. *In re Franke,* 345 N.W.2d 224, 228 (Minn.1984). While the referee's recommendation is entitled to great weight, it still remains, as we have frequently said, that final responsibility for determining the appropriate discipline rests solely with this court. *Id.*

In looking at our other cases, we do not find any case exactly like this one, nor should we expect to. Disciplinary cases are fact-specific and no two cases are quite alike. Nevertheless, we find guidance in our prior decisions. In *Franke, supra,* an attorney who neglected and mishandled guardianships was disbarred. "Where * * * an attorney exhibits callous disregard for the physical and financial well-being of vulnerable, dependent persons," we said, "that attorney has a heavy burden to persuade the court of his fitness to continue the practice of law." *Id.* In *In re Bialick,* 298 Minn. 376, 215 N.W.2d 613 (1974), we ordered disbarment for an attorney who, among other things, obtained funds by misrepresentation and use of his position and reputation as an attorney, fabricated facts, and repeatedly wrote checks against insufficient deposits. We said these incidents, even taken singly, would be enough for disbarment. In two recent cases, *In re Bernstein,* 404 N.W.2d 804 (Minn.1987), and *In re Kaine,* 424 N.W.2d 64 (Minn.1988), the attorneys had engaged in deceit, fabrication, and cover-ups; we imposed long suspensions (4 and 5 years, respectively) rather than disbarment because, as we noted, there was relatively small financial exposure, the incidents of misconduct were relatively isolated, and the attorneys were contrite.

Here the nature and cumulative weight of the offenses together with the consequences of the misconduct lead us to conclude that this case is more like those where we have imposed the sanction of disbarment. Respondent took advantage of a trusting, vulnerable client to put $100,-000 of the young man's money in respon-dent's precarious business venture in a transaction rife with conflicts of interest. In June and August of 1988 and again in February 1989, respondent engaged in a series of fraudulent misrepresentations to induce a bank to honor overdrafts and to induce two contractors to make construction commitments totaling over $1.5 million. In this connection, respondent fabricated documents and used his position and reputation as an attorney to further his deceitful designs. When the Director undertook to make inquiries, respondent was repeatedly uncooperative and less than candid. As the referee noted, respondent's explanation for not providing certain documents was "unbelievable" and "his failure to acknowledge much of his misconduct, even in the face of overwhelming testimony," was a matter for concern.

Respondent concedes he was careless, but seems unaware of the inadequacy of this concession. He points out that, although large sums were involved, no one has been financially harmed by his conduct. Clearly, however, the harm to the legal profession has been great and the potentiality for harm to certain parties was most serious. Respondent is an experienced, successful attorney, who was admitted to practice in 1954. There are no appreciable mitigating factors. Respondent became involved in a large real estate project, and when things began to go bad, he did not hesitate to engage in a series of calculated fraudulent practices to keep the project going. We conclude the appropriate sanction must be disbarment.

It is so ordered.

KEITH, J., took no part in the consideration or decision of this case.