**In re Petition for DISCIPLINARY ACTION AGAINST Dean D. LARSEN, an Attorney at Law of the State of Minnesota.**

No. C0-89-1404.

Supreme Court of Minnesota.

July 27, 1990.

William J. Wernz, Director of the Office of Lawyers' Professional Responsibility, Wendy Wilson Legge, Sr. Asst. Director, St. Paul, for appellant.

William C. Pribble, Jr., Minnetonka, for respondent.

PER CURIAM.

Following a 4–day hearing, Judge Jack J. Litman, referee, found that respondent Dean D. Larsen had violated certain Rules of Professional Conduct and recommended disbarment. The most serious misconduct grew out of respondent's handling of the financial affairs of his mother's elderly cousin, Mollie Miller.

The Director of the Professional Responsibility Board must prove misconduct by clear and convincing evidence. *In re Schmidt*, 402 N.W.2d 544, 545 (Minn. 1987). This court will not set aside the findings of a referee in a disciplinary action unless they are clearly erroneous. The court has deferred to the referee's findings when they rested on disputed testimony or in part upon respondent's demeanor, credibility or sincerity. *In re Ruhland*, 442 N.W.2d 783, 786 (Minn.1989); *see also In re Daffer*, 344 N.W.2d 382, 386 (Minn. 1984). Respondent ordered a transcript, hence the referee findings and conclusions of law are not deemed conclusive but are subject to our review. Rule 14(e), Rules on Lawyers Professional Responsibility; *In re Peterson*, 456 N.W.2d 89, 90 (Minn.1990).

### Misappropriation

Respondent was retained by Ms. Miller, his mother's cousin, whom he had known since childhood, in early 1985 to prepare her will and determine the status of some of her assets. At the time, she was 88 years old and in good mental health. Respondent accepted a retainer for his work for which he charged a "family" rate of $75 per hour. In reviewing her assets, respondent discovered that Ms. Miller had approximately $165,000 in cash, savings, and certificates of deposit in addition to some stock and her home. After discovering that Ms. Miller had the ability to pay, respondent raised his fee for his work under the power of attorney to $100 per hour.

In March 1985, at Ms. Miller's request, respondent prepared a power of attorney appointing himself Ms. Miller's attorney in fact which Ms. Miller and respondent executed in April 1985.[1] Ms. Miller retained signatory power over her checking account, and continued to write checks on this account for small items. She also received

---

1. The power of attorney document did not list any particular duties. It listed such powers as power to deal with tax obligations, arrange for medical care, and transfer assets. Respondent nevertheless repeatedly represented he would pay Ms. Miller's Heritage House and Colonial Acres bills, and also her pharmacy bills. He signed the RESIDENT MEMBER AGREEMENT for Heritage House, "Dean Larsen For Mollie Miller by POA." This document included terms and amount of payment. Although there does not seem to have been a written agreement for Colonial Acres, respondent orally approved the room rate upon admission, and repeatedly stated he would pay her bills. Finally, he personally guaranteed the bill.

her social security checks and a friend assisted her in managing this money.

Ms. Miller moved from her home to Heritage House, an assisted living facility, in March 1985. In April 1988, because of her deteriorating physical condition, she was transferred to Colonial Acres Health Care Center (Colonial Acres), a related nursing home. She was placed in a private room on the special care unit. She was hospitalized on March 25, 1989 and readmitted to the Colonial Acres Medicare unit on April 4, 1989. When her medicare coverage ran out, she was transferred to a semi-private room in a less expensive wing on April 13, 1989. She died May 23, 1989.

During the time respondent had power of attorney, he wrote 134 checks on Ms. Miller's account. Of these checks, 84 were payable to himself, one was used to pay his office telephone bill and the remaining 49 were paid to creditors of Ms. Miller.

From July 1985 through November 1988, respondent wrote checks to himself on Ms. Miller's account for approximately $90,000. He claims $50,000 of this amount was for a loan which Ms. Miller had authorized and the balance of approximately $40,000 was for fees for his services during this period.

The evidence was undisputed that respondent failed to pay Ms. Miller's bills in a timely fashion. Respondent represented to the nursing homes and others that he would pay the nursing home and pharmacy bills, but he did not pay a single monthly Colonial Acres bill. Because the Colonial Acres bill was not paid, Miller was transferred from a wing of the hospital which she preferred to a less expensive room in the facility. Respondent failed to pay Ms. Miller's pharmacy bill for several months. The pharmacy refused to fill prescriptions for Ms. Miller until Colonial Acres' management guaranteed the payment. When respondent did pay the pharmacy bill, an overdraft resulted in Ms. Miller's account of $450 which respondent never rectified. As a result, the bank closed the account. In addition, respondent did not pay property taxes on Ms. Miller's home in 1988 and 1989 even after receiving the real estate tax notices.

When Ms. Miller died, she owed Colonial Acres over $55,000 including late charges accruing at 18 percent per year. In assets, she had her home, some stock, $4,109 from social security checks and $6,613.74 in a time deposit account. Respondent had no access to either the social security money or the time deposit account.

Even though Miller's nursing home bills were not being paid in a timely fashion, respondent continued to write checks to himself on her account. Between April 1988 and March 1989, when her nursing home bills were not paid, respondent transferred $8,000 to himself. Two of these checks were designated "loan" either in Larsen's bank statement or the deposit slip for the check.

On fourteen occasions respondent made early withdrawals at penalty from Miller's certificates of deposits and then used all or part of these funds to write checks to himself. Respondent also paid his office telephone bill of $92.68 with one of Ms. Miller's checks.

The major factual dispute is whether respondent misappropriated all or a portion of the $90,000 which he withdrew from Ms. Miller's account. Respondent maintains that approximately $50,000 represented loans which Ms. Miller approved and for which respondent gave Ms. Miller demand notes.[2] Respondent always met in private with Ms. Miller to discuss her business so there were no witnesses to any of these discussions. The respondent claims that pursuant to Ms. Miller's oral authorization, he wrote checks to himself as and when he needed the money between April 15, 1986 and January 21, 1988 which came to a total of $50,025. Respondent testified that he gave Ms. Miller five unsecured demand notes between April 1986 and August 1987 totaling $50,000, plus 10 percent interest.

2. To repay the purported loans, respondent deposited with his attorney $50,000 which was placed in trust for Miller pending appointment of a personal representative. This was done only after the Lawyers Board Panel found probable cause for public discipline. Respondent asserts he tried to obtain funding before this time.

These notes "rolled over" as the amounts of the loans supposedly increased. These original notes were never found among Ms. Miller's personal property following her death.

Respondent provided the Director with two sets of copies of the demand notes. Respondent claims that one set was a file copy of the original set which he gave to Ms. Miller. When this disciplinary proceeding was instituted, he made an additional copy of the file copies. He testified he made the last set on the copier at his new office to which he moved in December 1988. He did not have access to that copier before that date. He provided the Director with both copies during June 1989. Respondent claimed that one set is a photocopy of the other.

The Director produced expert testimony disputing respondent's version of how the copies were made. The expert based her testimony on photocopier marks or "trash marks" found on the copies.[3] Such marks left by dirt on the glass and/or the drum can be unique to each copier. The expert testified that contrary to respondent's testimony, one set of notes was not a copy of the other. Rather, both sets were probably made on the same copier at the same time from a different set of documents. Thus, the two sets in evidence were apparently made on a copier to which respondent had no access until after the dates on the demand notes. The expert also concluded that the original demand notes must have been executed after December 1988, although the dates of the documents were between 1986 and 1987. Thus, respondent must have falsified the documents.

The referee found the respondent's testimony was not credible and that the expert testimony did undercut respondent's credi-

bility concerning the way in which the copies in the Director's custody were produced.

Other evidence supports the referee's finding that respondent misappropriated Ms. Miller's money. Before the first demand note, respondent wrote a check (number 1030) to himself from Ms. Miller's account for $1,000. Respondent testified at the referee hearing that the check represented anticipated fees. However, the "memo" section of the check bears the words "secured loan" which respondent testified he put in because. he thought it was "cute." He also wrote another check (number 1040) to himself for $1,000 before the first demand note with "loan" written into the memo section. Respondent was impeached with his own testimony from an earlier panel hearing wherein he stated that the checks were "probably" loans. Respondent also alleged that a later $5,000 check (No. 1139) represented "anticipated fees." However, he wrote the word "loan" on his bank statement next to the deposit entry for this check. Another $500 check (number 1144) was ostensibly for "fees;" however, respondent wrote "MAM Loan" on his copy of the deposit slip for this check. All of these checks were beyond the $50,000 in loans which Ms. Miller allegedly authorized.

On ten occasions, respondent made early withdrawals at penalty from Ms. Miller's time deposit accounts and used all or part of these funds to write checks to himself, which were allegedly loans from Ms. Miller. Ms. Miller never gave written permission for respondent to make any of these early withdrawals. Ms. Miller was a frugal person. The referee found it not credible that Miller authorized respondent to borrow these funds. The referee also

---

3. The expert was the state's "Question Document Examiner" with the Minnesota Bureau of Criminal Apprehension, and also the forensic science supervisor. She had eight years' experience in the question document section of the laboratory, had been the lead document examiner since 1984, and had been with the BCA since 1970. She had taken two and a half years of training in document examination, and worked several hundred cases in the document section. She attended question document schools at the FBI Academy and the Secret Service. Some of her initial training had specifically addressed photocopies, and she attended three one- or two-day workshops on photocopier evidence. She handled 20 to 25 cases involving photocopy evidence. At trial, respondent objected to the expert's testimony, claiming that the expert lacked foundation and expertise and knowledge of the exhibits. The referee overruled the objection.

found not credible respondent's assertion that Ms. Miller never demanded payment of the purported demand notes. The notes included a 10 percent interest rate, but for much of the last year unpaid nursing home bills were accruing late charges at 18 percent per year.

Other than the cancelled checks themselves, the only record of the alleged loans was a list connected with the $50,000 note. Respondent claimed that he kept lists for the other notes but he could not locate them. The referee found the testimony that other lists existed not credible. Clearly, the evidence supports the referee's finding that Respondent misappropriated $50,000 from Ms. Miller in violation of Rules 8.4(c) and 8.4(d) of the MRPC.

Respondent further claimed the remaining $40,000 he acquired from Ms. Miller's account represented properly earned fees at his $100 hourly rate for his services as attorney in fact. Respondent never kept time records or billed Ms. Miller for these fees. Respondent testified that most of the billed time was probably spent visiting Ms. Miller at the two nursing facilities. Respondent testified he visited Ms. Miller once a month at Heritage House for more than an hour each time and at Colonial Acres every other month for an hour. He also testified that he "probably" charged Miller for the time he spent requesting loans from her. As noted above, four checks totalling $7,500 now alleged to represent fees were contemporaneously noted as "loan" or "secured loan" on the check itself or the bank statement or deposit slip to respondent's account.

The Director introduced evidence tending to show that respondent could not have earned $40,000 as Ms. Miller's attorney in fact. He wrote only 49 checks on her behalf. Evidence at the hearing indicated that while Ms. Miller was at Heritage House, the director saw respondent only once at Ms. Miller's ninetieth birthday party. Dean Nelson, a friend of Ms. Miller and frequent visitor saw respondent on only one other occasion. Respondent visited Ms. Miller with his mother four or five times, staying approximately 30 minutes.

Colonial Acres' nurses who were on duty during the daytime, when respondent claimed to visit Ms. Miller, saw him only twice. Based upon this evidence, the referee found respondent's testimony not credible concerning the hours he spent providing legal services to Ms. Miller.

Many of the referee's findings are based upon conflicting testimony and credibility of witnesses. Based upon our review of the record, we cannot say that the referee clearly erred in finding that the respondent had not earned $40,000 as fees and therefore violated Rules 8.4(c) and 8.4(d) of the MRPC.

### Other Complaints

The referee found that respondent had practiced law while suspended for nonpayment of the attorney registration fee. Respondent claimed he was unaware until June 9, 1989 that he had been suspended which the referee found not credible because respondent received a letter from the Lawyers Board dated May 9. However, respondent was also on restricted status for failing to keep up with CLE requirements from December 27, 1988 until March 13, 1989. During this period respondent attended hearings and depositions and charged clients for time and never notified anyone that he was not there as an attorney. During the entire period of suspension, including the period of restricted status, respondent continued to correspond with clients on his letterhead and charge for his time. By engaging in the unauthorized practice of law, respondent violated Rule 5.5 of the MRPC.

It is undisputed that respondent's books and records did not comply with Amended Opinion No. 9 of Lawyers Board for the years 1986, 1987 and 1989 and the referee found that Respondent had violated Rule 1.15(b)(3) and (g). To that extent, respondent falsely certified to this court that he maintained books and records as required by the Minnesota Rules of Professional Responsibility, and thereby violated Rules 1.15(h) and 8.4(c) of the MRPC.

The final complaint concerned respondent's representation of Gloria Bildsten in

a dispute with the Gopher Campus Motor Lodge, Inc. (GCML). Bildsten and GCML entered into an agreement under which GCML purchased her GCML stock. GCML was to make monthly payments of $2,000 to Bildsten until 1989 or 1990. GCML defaulted on the monthly payments in 1985 and owed approximately $100,000 to Bildsten. Respondent sent demand letters but did not institute suit or take other collection steps. Respondent stated that he determined that he needed to wait until the agreement ran out in 1989 or 1990. Otherwise, he would have to sue repeatedly as the installments became due. Respondent and Bildsten disagree as to what he told Bildsten concerning the status of her lawsuit. Respondent claims he told her he would not be able to sue until 1989 or 1990 and she claims that he simply told her he was "waiting for a court date" and that "the courts were full." She also claimed that he failed to respond to her letter. The referee found that respondent sent Bildsten a letter dated October 16, 1987 in which he mentioned proceeding with the lawsuit when the time for all payments had expired. The referee found, however, that he failed to communicate the plan adequately to Bildsten and therefore violated Rules 1.4, 8.4(c) and 8.4(d) MRPC.

### Discipline

This court gives great weight to the referee's recommendations as to sanctions but this court is the final determiner of appropriate sanctions. *In re Munns,* 427 N.W.2d 670, 671 (Minn.1988).

The referee recommended disbarment and we agree. "While each case is different, in cases of extensive misappropriation of client funds, this court has most often ordered disbarment. * * * In cases involving misappropriation where we have ordered a sanction less severe than disbarment, substantial mitigating circumstances have existed." *In re Austin,* 333 N.W.2d 633, 634–35 (Minn.1983). Such misappropriation cases require the strictest discipline in order to maintain public confidence in the legal profession. *Id.* at 635. The misappropriation in this case is extensive, involving large sums of money taken over a period of several years from the estate of a vulnerable elderly person. The only mitigating factor is respondent's lack of prior discipline. Respondent provided several character witnesses but those who testified were not aware of the details of the accusations against respondent. Aggravating factors include respondent's self-dealing, and the vulnerability of Ms. Miller. Respondent also has refused to acknowledge that his conduct was wrong.[4]

Because the misappropriation in this case justifies disbarment, we need not address at length the other allegations against respondent. The referee correctly found that respondent had practiced law while suspended for nonpayment of attorney registration fees, and the referee did not believe that respondent was unaware of the suspension for the entire time. In the Gloria Bildsten matter, the referee correctly found that respondent failed to adequately communicate with Bildsten. Finally, the referee correctly found that in 1986, 1987 and 1989, respondent had falsely certified to this court that he maintained books and records as required by the Minnesota Rules of Professional Responsibility.

We conclude the appropriate sanction must be disbarment. IT IS SO ORDERED.

---

4. Even if respondent had borrowed rather than misappropriated the $50,000, the facts of this case would justify disbarment. The referee correctly found that an attorney-client relationship existed between respondent and Miller. Miller was a vulnerable client, due to her age and the reliance she placed upon respondent's handling of her affairs. Even under respondent's version of the facts, the alleged loan transaction was not "fair and reasonable" as Rule 1.8(a)(1) required.

The "loans" were unsecured, and respondent failed to disclose to Miller any conflict of interest or risks involved in the loans. Rules 1.7(b)(2); 1.8(a)(1). There was no written authorization from Ms. Miller, as required by Rule 1.8(a)(3). Respondent took advantage of a vulnerable client by obtaining an alleged loan which was not fair and reasonable. Disbarment would therefore be appropriate. *See In re Peterson,* 456 N.W.2d 89 (Minn.1990).