In re Petition for DISCIPLINARY AC-
TION AGAINST Kenneth E. KEATE,
an Attorney at Law of the State of
Minnesota.

No. C1–91–665.

Supreme Court of Minnesota.

July 17, 1992.

As Corrected July 17, 1992.

As Amended on Denial of Rehearing
Sept. 2, 1992.

Patrick R. Burns, Sr. Asst. Director, Of-
fice of Lawyers Professional Responsibili-
ty, St. Paul, for appellant.

Randall D.B. Tigue, Minneapolis, for re-
spondent.

PER CURIAM.

In this disciplinary proceeding, the ref-
eree found that respondent's conduct, tak-

en together with his prior discipline, constituted an ongoing pattern of misconduct in violation of Rules 1.3, 1.4 and 3.2 of the Minnesota Rules of Professional Conduct. The referee recommended that respondent be publicly reprimanded and be placed on supervised probation for one year.

Respondent has been licensed to practice law in Minnesota since 1976. The director brought charges of professional misconduct against respondent based on his representation of clients in four separate matters. One of these matters was dismissed on the director's motion at the hearing. The charges of professional misconduct stem from respondent's representation of two clients in a bankruptcy; a client in a tax matter; and another client in a dissolution.

In the first matter, a young married couple met with and retained respondent on April 4, 1989 to handle a Chapter 13 bankruptcy filing. The couple was seeking Chapter 13 protection because of the amount they owed the IRS in back taxes, penalties and interest. The following week, the couple again met with respondent at which time he roughed out a Chapter 13 payment plan. The wife testified that respondent told them to keep minimal money in their checking account since the IRS could levy on it at any time. Respondent, on the other hand, testified that he told the couple to open a new checking account since their present account could be levied upon by the IRS at any time. On June 2, 1989, the IRS levied on the couple's checking account and seized $917.86.

On June 6, 1989, the wife sent a letter to respondent inquiring whether the bankruptcy petition could be filed by July 10. The couple was concerned since their past due property taxes with penalties were due on July 15. Respondent testified that he told the couple not to worry about paying the property taxes because it would not make much difference if the bankruptcy petition was filed within the next two or three weeks since that amount would just be added to the bankruptcy petition.

On July 26, 1989, the couple met with respondent and signed the bankruptcy petition. The petition was filed on July 31. The wife testified that respondent never informed them that the petition was only a partial filing. She testified that her first notice that the petition was only a partial filing was when she received a notice from the bankruptcy court which set August 15, 1989 as the deadline to complete the Chapter 13 filing. On August 15, 1989, respondent moved the court for an order extending the time to complete the filing. The wife testified that respondent never informed them of the motion to extend time and that the notice from the bankruptcy court was how they learned of the motion. The court granted an extension until August 25. The wife testified she attempted to reach respondent on August 23 and 24 and left messages which were not returned. The wife testified that she reached respondent on August 25 and told him she was concerned since the completed filing was due on that day. She noted that respondent was surprised and thought that August 30 was the due date and told her he would get back to her, which he did not do. Respondent concedes that he mistakenly believed that the filing deadline was August 30. The couple's next contact with respondent was a call from respondent's secretary setting up a meeting for August 30. Respondent filed a second motion for extension requesting an additional five days to complete the filing. This motion was denied.

On August 30, 1989, the couple met with respondent and signed the rest of the papers to complete the initial filing. Respondent also had the couple sign a second petition in case he was required to refile the petition. When the couple returned home after this meeting, they received a notice from the bankruptcy court dismissing their initial petition. The wife testified that respondent never told them of the dismissal. Respondent then moved the court to accept the initial filing and reverse the dismissal. The court set a hearing date for September 13, 1989. Again, the wife testified that respondent never gave them notice of this motion.

On September 8, 1989, the wife sent a letter to respondent concerning her car loan with her credit union. The letter stated that if the loan was not paid off by September 15, 1989, her car would be repossessed. Respondent testified that he decided to abandon the September 13 motion because of the couple's need to have the petition filed by September 15. Respondent was concerned that the bankruptcy judge would take the matter under advisement and not issue a decision until after September 15. Respondent, however, failed to withdraw the motion and filed a second petition on September 15. On September 15, the couple received notice from the bankruptcy court that it had denied respondent's September 13 motion to accept filing and reverse the dismissal. The wife testified that respondent never informed them of his intentions to file a second petition on September 15. As a result, the wife's father paid off the car loan because she thought the car was going to be repossessed. After the second petition was filed, the couple fired respondent because he had failed to keep them informed.

In the second matter, a retired farmer retained respondent in the fall of 1989 to determine his state and federal estimated taxes and to determine the capital gains consequences from the sale of a home in Indiana and the subsequent purchase of a home in Minnesota. On October 3, 1989, the client met with Richard Miller, an accountant employed by respondent, to discuss his taxes. On October 24, 1989, the client met with respondent and Miller to discuss his taxes further. Respondent considered this to be a complex situation because he believed there was a question as to whether the client acquired title to the Indiana land by inheritance in 1987 or by quitclaim deed in 1977. Since respondent believed the client could save a substantial sum of money in capital gains taxes, he advised the client to hire Indiana counsel to research the issue further. The client, however, insisted that there was no need for any research and requested the bottom line figure for his estimated taxes. Respondent concedes that it was clear that the client did not understand why any research was needed.

The client testified that he "assumed" respondent would complete the necessary tax forms which had to be filed by January 16, 1990. Respondent never completed these forms. Respondent and Miller vehemently deny that the client ever requested that the actual tax forms be filled out. They added that they presented the client with the numbers to be filled in on the estimated tax forms. Respondent testified that he normally determines the estimated tax due and the clients themselves fill out the estimated tax forms because the forms are quite simple. On November 22, 1989, the client picked up his old tax returns and paid respondent $500 for his services. The client cleaned out his file in early January 1990 and had an accountant fill out the estimated tax forms.

In the third matter, a client contacted respondent in February 1990 to represent her in an uncontested divorce. At their first meeting, respondent requested that the client provide him with the information necessary to proceed with the dissolution. The client and her husband had essentially agreed on the distribution of property. In addition, no minor children were involved. Because it was tax time, the client realized that respondent would not be able to proceed with the filing of the dissolution immediately.

On May 23, 1990, respondent sent a letter to the client stating that he had completed a rough draft of the petition. The letter requested additional information so that respondent could complete the petition. On August 14, 1990, respondent sent another letter to the client stating that he needed additional information to complete the petition. Respondent also enclosed a partially completed petition for the client's review. By September, respondent had all the information he needed to complete the dissolution. On September 21, respondent sent what he believed to be the final copy of the summons and petition for the client's review.

In September 1990, the client's husband retained an attorney to find out what was

taking so long to complete the dissolution. Initially, the client and her husband thought respondent could complete the uncontested divorce by himself. On October 17, 1990, respondent received a letter from the husband's attorney. The letter confirmed a telephone conversation with respondent in which respondent claimed that the summons and petition were completed and that he expected to have the stipulation completed within the next week. The letter also confirmed respondent's promise to mail the documents when they were finished. The letter also indicated that the husband was "very anxious" to conclude the dissolution quickly. Respondent testified that he did not immediately send the summons and petition because the client had not brought back the September 21 petition he had sent for her review. The client met with respondent on November 12, and she verified and signed the petition.

On December 5, 1990, the husband's attorney again wrote a letter to respondent which confirmed a telephone conference in which respondent promised to send the summons and petition so that the husband could acknowledge service. The letter also indicated respondent would be sending the stipulation soon thereafter. Respondent sent the summons and petition out immediately. Respondent testified that he would not send the stipulation until he received the admission of service. On December 21, 1990, the husband's attorney wrote a letter to respondent which indicated that further discussions and agreements had been entered into between the couple regarding the distribution of assets. The letter set out the new agreements which were to be incorporated in the stipulation respondent was working on.

The client testified that each time she inquired about the stipulation, respondent told her it would be ready the next week. The client estimates that she called respondent seven or eight times regarding the stipulation. Because respondent was taking so long to complete the stipulation, the client wanted the file back. Respondent, however, told her the stipulation would be ready on January 21, 1991. On January 21, respondent's secretary called the client and

informed her that respondent's paralegal, who was typing the stipulation, was out sick. As a result, the stipulation was not finished and the client needed to reschedule. At this point, the client terminated respondent and had her husband's attorney complete the dissolution.

Respondent's prior disciplinary history includes two prior incidents of professional misconduct. In 1983, respondent was issued an admonition for neglect of a legal matter entrusted to him, failure to return a client's file and delay in responding to a disciplinary investigation. In 1986, by stipulation, respondent was issued an admonition for failing to adequately explain a legal matter to his client.

The referee found that respondent's conduct, taken together with his prior incidents of discipline, constituted a pattern of misconduct in violation of Minn.R.Prof. Conduct 1.3, 1.4 and 3.2. Pursuant to Rule 14(e), Rules on Lawyers Professional Responsibility (RLPR), respondent ordered a transcript of the hearing. Respondent, therefore, challenges the referee's findings, conclusions and recommendation. Respondent also argues that he was deprived of due process of law when other instances of noncommunication and neglect, involving the same clients but not specifically alleged were revealed at the hearing.

### I.

"There is no question that attorneys subject to disciplinary investigations are entitled to due process." *In re N.P.*, 361 N.W.2d 386, 394 (Minn.1985) (citing *In re Ruffalo*, 390 U.S. 544, 550, 88 S.Ct. 1222, 1225–26, 20 L.Ed.2d 117 (1968)). Although disciplinary investigations are not governed by the technical rules and formal requirements of civil or criminal procedure, due process requires that "the charges of professional misconduct, though informal, should be sufficiently clear and definite, in the light of the circumstances of each case, to afford the respondent an opportunity to prepare and present his defense." *In re*

*Peterson,* 260 Minn. 339, 345, 110 N.W.2d 9, 13 (1961).

Respondent argues that he was deprived of due process of law when the referee made findings of fact concerning the bankruptcy matter which included allegations which were not part of either the charges of unprofessional conduct or the petition before this court. Respondent argues that he had no notice that any misconduct would be based on the allegation that he failed to provide the couple with notice of various bankruptcy motions. While respondent raises some valid concerns, we believe that under the facts and circumstances of this case respondent had adequate notice of the charges and allegations made against him. As the director points out, respondent was charged with a pattern of misconduct which included noncommunication with clients. Respondent was not prejudiced by the additional facts that were revealed at the hearing concerning the same clients and the same rule violations. *See Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 655 n. 18, 105 S.Ct. 2265, 2284 n. 18, 85 L.Ed.2d 652 (1985). No new charges were brought against the respondent based on these additional facts. Although we believe the director did not violate respondent's right to due process of law, we caution the director's office in the future to draft its charges with specificity.

## II.

■ The director is required to prove by clear and convincing evidence that respondent violated the Rules of Professional Conduct. *In re Schmidt,* 402 N.W.2d 544, 545 (Minn.1987). On review before this court, the referee's findings of fact will not be set aside unless clearly erroneous. *In re Pyles,* 421 N.W.2d 321, 325 (Minn.1988). With these standards in mind, we evaluate respondent's conduct to determine whether it constituted a pattern of neglect and noncommunication in violation of Minn.R.Prof. Conduct 1.3, 1.4 and 3.2.[1]

In the bankruptcy matter, respondent challenges all of the findings that he failed to communicate with the couple. In particular, the referee found respondent did not respond to the couple's concern about filing the bankruptcy petition by July 10 because of the property tax deadline of July 15. Both the wife and respondent testified that respondent told the couple not to pay the taxes since the taxes would be included in the Chapter 13 filing. Therefore, the referee's finding that respondent did not respond to the couple's concerns in July is not supported by the record.

With regard to the other findings that respondent failed to communicate with the couple, the testimony of the wife and respondent are totally at odds. The wife testified that respondent never told them that he was completing a partial filing nor of the various motions he submitted to the bankruptcy court for extensions of time and for acceptance of the filing and reversal of the dismissal. The wife also testified that respondent did not inform them of his plans to protect their interests as the September 15 date for repossession of their car approached. Respondent, on the other hand, maintains that he informed the couple of all these motions and was in constant contact with the couple in September. This matter turns on the credibility of the witnesses. The referee, having observed the demeanor of the witnesses, is in the best position to judge their credibility. *See In re Andrew,* 465 N.W.2d 576, 577 (Minn. 1991). In *In re Ruhland,* 442 N.W.2d 783, 786 (Minn.1989), this court explained:

> When disputed fact questions exist, we afford great weight to the referee's findings. *In re Simmonds,* 415 N.W.2d 673, 676 (Minn.1987). This is especially true

**1. Rule 1.3 Diligence**

A lawyer shall act with reasonable diligence and promptness in representing a client

**Rule 1.4 Communication**

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

**Rule 3.2 Expediting Litigation**

A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

when the dispute is presented by conflicting testimony. *See In re Daffer*, 344 N.W.2d 382, 386 (Minn.1984) (the referee had the opportunity to observe respondent and evaluate the evidence, and the court accepted his evaluation of respondent's character).

Applying these standards, we hold that it was not clearly erroneous for the referee to accept the wife's testimony and disregard respondent's testimony.

In the tax matter, respondent disputes three of the referee's findings. First, respondent disputes that the client left his office "with the expectation of receiving the necessary completed estimated income tax forms." Respondent and Miller both testified that the client never requested that the actual estimated tax forms be filled out. They added that the form was so simple that they normally just provided the figures to be put on the form and the clients completed the form themselves. The client, however, testified that he "assumed" the forms would be completed. The client testified further that he wanted respondent to complete his estimated taxes. Clearly, the client and the respondent did not have the same understanding as to what exactly respondent was supposed to accomplish. The record, however, does support the referee's finding that the client had an *expectation* that his estimated tax returns would be completed. Under Minn. R.Prof. Conduct 1.4(b), the duty to communicate, respondent had an affirmative duty to explain to the client how he intended to proceed on the matter. Such an explanation would have avoided the later misunderstanding.

Second, respondent disputes that the client made any calls to his office in which he received unsatisfactory responses concerning his estimated tax forms. The client, however, did testify that he attempted to contact the respondent several times leaving messages each time and that some of these were not returned. The client testified that he was calling respondent

because he was "anxious" about the upcoming deadline for filing the estimated tax returns.

Third, respondent disputes that any misconduct can be inferred from his failure to send a letter outlining the client's tax situation. We agree that attorneys should not be required to send letters outlining their clients' rights and obligations. Attorneys, however, are still obligated to effectively communicate with their clients and to keep them adequately informed. Clearly, respondent failed to do so here.

In the dissolution matter, respondent maintains that any delay was caused by the client herself. It is not disputed that respondent had all the information he needed to complete the dissolution in September of 1990. It is also not disputed that respondent sent the client a proposed final petition for her review on September 21, 1990. Yet, the petition was not signed by the client until November 12. With regard to the stipulation, respondent admits he promised to forward the stipulation to opposing counsel in October and again in early December. Respondent did not dictate the stipulation until January 20, 1991 over three months after he had promised to provide it to opposing counsel.

Although this dissolution arguably involved some complex tax problems due to the property holdings of the parties, the matter was uncontested and respondent was aware in September of the parties intent to get the dissolution taken care of quickly. The record, therefore, supports the referee's finding of lack of diligence and failure to expedite litigation.

### III.

The purpose of discipline is not to punish attorneys but to protect the courts and the public and to deter future misconduct. *In re Isaacs*, 406 N.W.2d 526, 529 (Minn.1987). Although the referee's recommendation is entitled to great deference, the "final responsibility for determining the appropriate discipline rests solely with this court." *In re Peterson*, 456 N.W.2d 89, 93 (Minn.1990). In reaching this deter-

mination, this court takes into consideration the following factors: (1) the nature of the misconduct; (2) the cumulative weight of the disciplinary violations; (3) the harm to the public; and (4) the harm to the legal profession. *Isaacs,* 406 N.W.2d at 529. In imposing discipline, the court looks at the facts of each case together with any aggravating or mitigating circumstances. *In re McGrath,* 462 N.W.2d 599, 601 (Minn. 1990).

Respondent's prior discipline includes incidents of neglect and failure to adequately explain a legal matter to a client. Here, respondent failed to communicate with his clients, showed a lack of diligence and failed to expedite litigation in a timely fashion. This indicates that the prior admonitions were not adequate to prevent further misconduct of a similar nature. Therefore, discipline is necessary in this case.

Respondent argues that a public reprimand is the most this court has imposed in cases far more egregious than this situation. We disagree. In our recent decision of *In re Besikof,* 483 N.W.2d 80 (Minn. 1992), we dealt with a similar situation. Besikof had been appointed to represent a defendant in a criminal appeal to the Eighth Circuit. Besikof failed to pursue the appeal and was suspended for 60 days from federal practice. Arguably, no prejudice resulted from Besikof's inadequate representation as the defendant voluntarily dropped the appeal. Nevertheless, discipline was warranted. We noted:

> Respondent's disciplinary history involves neglect of client matters. This case involves a lack of diligence in pursuing a client's case. In sum, respondent's misconduct represents a continuing pattern of paying inadequate attention to his clients' interests and a failure to develop a systematic means of office management to avoid such problems. As the comments to Rule 1.3 suggest, that undermines public confidence in the legal profession, which harms the public, the legal profession and the justice system. Such misconduct must be deterred.

*Id.* at 83. Ultimately, we suspended Besikof for 30 days and placed him on two years probation only after probation did not deter respondent from further misconduct. Although respondent's conduct does not warrant suspension in this case, we believe probation will assist respondent in adopting office procedures so that he may better communicate with his clients and complete his work in a timely fashion.

Based upon our thorough review of the record, we hold that a public reprimand and supervised probation for six months is the appropriate discipline. Respondent must also pay costs of $750 pursuant to Rule 24, RLPR.

It is so ordered.