In re Petition for DISCIPLINARY AC-
TION AGAINST Bruce P. WYANT, an
Attorney at Law of the State of Minne-
sota.

No. C3–94–519.

Supreme Court of Minnesota.

June 23, 1995.

Samuel C. Tripp, Edina, for respondent.

Marcia A. Johnson, Director, Lawyers Pro-
fessional Responsibility Bd., Patrick R.
Burns, Sr. Asst. Director, St. Paul, for peti-
tioner.

## OPINION

PER CURIAM.

This matter is before this court upon peti-
tion by Marcia Johnson, Director of the Of-
fice of Lawyers Professional Responsibility.
On February 17 and June 9, 1994, the Di-
rector filed a petition and supplemental peti-
tion respectively for disciplinary action
against Bruce P. Wyant. On August 22, 23,
29, and 31, 1994, Honorable William Johnson,
acting as referee, conducted a hearing on the
Director's applications. On October 7, 1994,
Judge Johnson issued findings, conclusions,
and recommended disbarment. Wyant time-
ly ordered a transcript of the proceedings,
thus Judge Johnson's findings are not conclu-
sive. Minn.R.Prof.Cond. 14(e).

Bruce P. Wyant was admitted to practice
law in the State of Minnesota in October
1969. He practiced with the firm of Dahl &
Wyant from 1969 to 1975. He was a sole

practitioner from 1975 to 1981, and in 1981, he and D. John Morgeson formed the firm of Wyant & Morgeson, P.A. (Firm). Wyant was one of two partners in the Firm until its dissolution in early 1993. Since May 1993, Wyant has been a sole practitioner.

Wyant's alleged misconduct arises from loans made from clients while he was a partner in the Firm. Specifically, from May 1983 through February 1993, loans were arranged from clients of the Firm to (1) the Firm; (2) the principals of the Firm; and (3) a corporation in which the principals were part owners. The referee found Wyant "was directly and personally involved in over $1,400,000 of loans from his law firm's clients to himself, to his law firm, and to a corporation in which he was a part owner. Over $1,200,000 of these loans are unpaid and overdue, and [Wyant] has personally guaranteed over $1,100,000 of these loans." The referee also found irregularities with the Firm's handling of a client's retainer, and the extent upon which the Firm relied on client to client loans as a source of revenue.

### Loans From Clients to the Firm

From 1981 through 1992, the Firm borrowed over $750,000 from seven of its clients; $638,000 in principal remains unpaid. In only one of the five years from 1988 through 1992 did the Firm show a positive cash flow after payments to the partners. The Firm's gross receipts exceeded expenses and interest payments annually by an average of $66,000 over this five-year period. The partner's draw over this period, however, averaged just over $100,000 a year and the Firm paid an average of $31,000 on the principal. Thus, an average shortfall of $65,000 per year existed. This shortfall was met by borrowing from clients. Thus, the Firm's debt increased from $331,000 at the end of 1987 to $638,500 at the end of 1992.

The referee found Wyant was directly involved in loans from clients to the Firm totaling $589,000 of which $559,000 remains unpaid. Wyant signed the notes in his capacity as shareholder, and personally guaranteed the payment of $504,000 of the unpaid loans. In soliciting loans from its clients, the Firm did not disclose that its interest was

adverse to the client's interest and did not advise them to seek independent legal advice. No written consent from the clients agreeing to the transaction existed. The loans were not secured for repayment. There was not adequate disclosure to the clients of the Firm's financial condition and its reliance on the loans for its operating expenses. There was not adequate disclosure of the risks inherent in the transactions, and no disclosure to the clients of the financial conditions of the individuals guaranteeing the loans. Thus, the referee found these loans were not fair and reasonable.

Wyant claims he played no part in arranging or soliciting the loans. He claims he relied on Morgeson's assurances that he had given all lenders adequate disclosures of the financial risks of the loans and the potential conflict of interest, had advised them that they could seek independent legal advice, and that the lenders entered into the transactions consensually.

Evidence indicates that, although Morgeson was more involved in the solicitation of the loans, Wyant was present at some point in some of the discussions with Morgeson regarding the loans. In addition, Wyant had a direct professional relationship with three of the client-lenders. Moreover, the referee found that Morgeson could not have made any disclosure of Wyant's net worth to support his personal guarantees of the loans, because Wyant had never given Morgeson a personal financial statement. Finally, Wyant's repeated act of guaranteeing these loans cannot be dismissed as some unrelated event to the loan. Although Wyant's guarantees of these loans may not have involved direct contact with the clients, they were an essential element in procuring the loans, and thus constituted direct involvement.

### Loans From Clients to Wyant

From 1985 to 1990, Wyant borrowed money personally from three clients of the firm. In 1985 Wyant borrowed $60,000 from Eileen Zimmerman; in 1986 he borrowed $60,000 from Helen Ainsley and used the proceeds to repay Zimmerman; and in 1990 he borrowed $65,000 from Nancy Kish and used the proceeds to repay Ainsley. Wyant ultimately

repaid Kish in June 1993. All of the loans were secured by a mortgage on his home; however, Wyant failed to record the mortgage in favor of Eileen Zimmerman.

In each of these loans, Wyant neither disclosed that his interest was adverse to the client's interest nor advised the clients to seek independent legal advice. He did not disclose his financial condition to them. He failed to obtain the client's written consent prior to entering into the transaction, and failed to provide the client-lender with the protections ordinarily required by a mortgagee such as a title opinion, an appraisal, a judgment and tax lien search, and evidence that the mortgagee is listed on the homeowner's insurance policy. He also failed to provide the client-lender with original loan documents or even, in some cases, a copy of the loan documents. The referee found that although the loans have all been repaid, they were not fair and reasonable transactions.

### Loans From Clients to TLDI

On March 13, 1991, Wyant acquired a one-sixth interest and Morgeson acquired a one-third interest in Those Little Donuts International, Inc. (TLDI). Thereafter, Wyant was elected Secretary–Treasurer of the corporation and Morgeson was elected President. TLDI was an offshoot of Those Little Donuts, Inc. (TLD), a company owned and operated by clients of the Firm. TLDI was intended to manufacture and sell machines to make mini-donuts. The consideration for Wyant's one-sixth share of TLDI was his personal guarantee of a $135,000 note from TLDI to TLD. At the time Wyant guaranteed this debt, he had personal guarantees of other notes outstanding totaling $484,000. Thus, the referee concluded, because of the extraordinary amount of personal guarantees issued by Wyant, his guarantee here was worthless.

In 1991 TLDI had gross revenues of $6,000. It took out loans that year totaling $175,000. Out of these sums the corporation paid $40,400 or 22 percent of the new loans to the Firm in fees and expenses. In 1992 TLDI had gross revenues of $32,670 and took out new loans totaling $469,000. Of this sum, $41,800 or 11 percent was paid to the

Firm in fees and expenses. Finally, in the first two months of 1993, prior to TLDI shutting down, the corporation had gross revenues of $3,400 and received loan proceeds of $78,000. TLDI paid $6,600 or 8 percent of the new loans to the Firm in fees and expenses. Morgeson additionally was paid director fees and received loans of $2,000 in 1991 and $29,400 in 1992.

Wyant personally guaranteed all but two of these loans. Wyant and Morgeson did not disclose that their interest and the client's interest were adverse, nor advise the clients to seek independent counsel. No written consent was obtained from the clients. There was no adequate disclosure to the lenders of TLDI's financial condition or of Wyant's or Morgeson's financial condition. There was no disclosure that the Firm was receiving annual payments from TLDI of approximately $45,000 per year in fees, rent, and expenses and that TLDI had loaned almost $30,000 to Morgeson in 1992, or that the interest payments made by TLDI in 1991 and 1992 were greater than the gross receipts in those years. With the exception of one client, all of the loans were unsecured. With the exception of two clients, the clients viewed the Firm as their attorneys in the transaction. Finally, with the exception of four clients, neither Wyant nor Morgeson disclosed to the clients that they were shareholders in TLDI.

Wyant attributes these deficiencies to Morgeson. He contends that all the loans were solicited and arranged by Morgeson from his clients and that he relied on Morgeson to provide the required disclosures. The referee rejected this argument finding:

> [Wyant] cannot plausibly deny his responsibility for making the required disclosures. [Wyant] *knew* that Morgeson had not and could not have made the required disclosures to the client lenders. Wyant had never given Mr. Morgeson a financial statement setting forth [Wyant's] net worth, therefore Morgeson could not have made any disclosure of [Wyant's] net worth to support [Wyant's] personal guarantee. [Wyant] also was aware that no financial statement had ever been prepared for TLDI prior to 1993. Thus he

knew that Morgeson could not have made an adequate disclosure of the risks of loaning money to the company. [Wyant] knew of the extremely speculative nature of the business, and he knew that the company had not even adequate gross receipts to cover the payments to Wyant & Morgeson or the interest payments due. He knew the only way interest payments were being made and the only way any loans were being repaid by TLDI was by securing additional loans.

In sum, [Wyant] knew that Morgeson did not have sufficient information to make the necessary disclosures on the loans, and he knew the loans were not fair and reasonable transactions for the client-lenders to enter into.

The referee concluded that, as a result of Wyant's conduct and involvement in the various loans from clients to the firm, to TLDI, and to himself, he had violated DR 5–101(A), DR 7–101(A)(3), DR 1–102(A)(4), DR 5–105, Minn.Code Prof.Resp. (1985); Minn.R.Prof.Conduct, Rules 1.8(a), 1.4(b), 1.7(b), 8.4, 5.1(c) (1985), and Minn.Stat. § 80A.01 (1994). The referee further concluded Wyant's conduct "constituted a pattern of conflict of interest, fraud, and dishonesty."

■ A referee's findings will not be set aside unless they are clearly erroneous. *In re Ruffenach*, 486 N.W.2d 387, 389 (Minn. 1992). On review, the referee's findings as to disputed facts are given great deference, particularly when the dispute is presented by conflicting testimony. *In re Iliff*, 487 N.W.2d 234, 236 (Minn.1992). Although Wyant does not dispute the referee's conclusion that he violated a great number of Rules of Professional Responsibility and Ethical Rules, he contends he did not act fraudulently or dishonestly. Instead Wyant claims, the "fraud and dishonesty was that of D. John Morgeson." We comment here only on the rules that the referee found Wyant had violated, which Wyant now challenges.

■ The referee concluded Wyant violated Minn.R.Prof.Conduct 5.1(c), which provides:

A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:

 (1) the lawyer orders or, with knowledge of specific conduct, ratifies the conduct involved; or

 (2) the lawyer is a partner in the law firm in which the other lawyer practices, * * * and *knows* of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

(Emphasis added). Knowledge is defined as: 'Knowingly', 'Known', or 'Knows' denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances.

Minn.R.Prof.Conduct Preamble.

Wyant contends that Rule 5.1(c) requires specific knowledge of the conduct constituting a violation of the rule. Wyant admits that he was negligent in relying on Morgeson's representations that he had made full disclosure of the financial situation of the borrowers, risks of investment, and of the potential conflicts of interest and in failing to independently investigate the matter. However, such reliance, he argues, does not constitute actual knowledge. He argues he did not learn of the misrepresentations and omissions made by Morgeson until some time after mid-February 1993, when the lenders began to come forward.

We find Wyant's contentions unpersuasive. Evidence indicates Wyant was familiar with the circumstances of the Firm and was aware of the amount of notes he had guaranteed. Wyant should have known that Morgeson was not providing sufficient disclosures to the clients since he had not provided Morgeson with sufficient information. Given the staggering amount of loans he blithely guaranteed, it is impossible to believe that Wyant was not aware that Morgeson's assurances were false and that Morgeson's actions were in violation of the Rules of Professional Conduct. We agree with the referee's conclusion and find that by his conduct in continuing to sign, guarantee and accept the benefits of the loans, Wyant, at a minimum, ratified Morgeson's misconduct. Wyant took no action to remedy the situation even though he knew of

the misconduct at a time when injury could have been avoided or mitigated to the client. Finally, we find Wyant's attempt to shift the blame to his partner Morgeson unpersuasive. Clearly Morgeson was more directly involved in the solicitation and execution of the loans than Wyant, however, that does not absolve Wyant for his own involvement.

 The referee recommended disbarment. This court accords the referee's recommendation great weight; however, it retains final authority for determining the appropriate discipline. *In re Perry*, 494 N.W.2d 290, 293 (Minn.1992). The purpose of sanctions is not to punish the attorney, but to protect the public, to guard the administration of justice, and to deter future misconduct. *In re Jensen*, 418 N.W.2d 721, 722 (Minn.1988). "[F]actors to be examined include the number of clients harmed, the extent of the clients' injuries, prior misconduct and discipline and any mitigating circumstances." *In re McCoy*, 447 N.W.2d 887, 890 (Minn.1989). Although this court strives to be consistent with its sanctions, prior disciplinary case law is helpful only as analogy; the facts of each case independently dictate the appropriate discipline. *In re Boyd*, 430 N.W.2d 663, 664–65 (Minn.1988).

 We find our analysis in *In re Larsen* persuasive. In that case, this court ordered disbarment after finding an attorney had misappropriated $50,000 from a client. 459 N.W.2d 115, 120 (Minn.1990). In response to the attorney's argument that the transfer of funds was not misappropriation but rather a loan, this court stated:

Even if respondent had borrowed rather than misappropriated the $50,000, the facts of this case would justify disbarment. The referee correctly found that an attorney-client relationship existed between respondent and Miller. Miller was a vulnerable client due to her age and the reliance she placed upon respondent's handling of her affairs. Even under respondent's version of the facts, the alleged loan transaction was not 'fair and reasonable' as Rule 1.8(a)(1) required. The 'loans' were unsecured, and respondent failed to disclose to Miller any conflict of interest or risks involved in the loans. Rules 1.7(b)(2);

1.8(a)(1). There was no written authorization from Ms. Miller as required by Rule 1.8(a)(3). Respondent took advantage of a vulnerable client by obtaining an alleged loan which was not fair and reasonable. Disbarment would therefore be appropriate.

*Id.* at 120 n. 4.

Similarly, this court ordered disbarment where an attorney misappropriated $100,000 of a client's money to invest in a real estate development in which he had a financial interest. *In re Peterson*, 456 N.W.2d 89 (Minn.1990). Specifically, this court stated:

Respondent took advantage of a trusting, vulnerable client to put $100,000 of the young man's money in respondent's precarious business venture in a transaction rife with conflicts of interest * * * Respondent concedes he was careless, but seems unaware of the inadequacy of this concession.

*Id.* at 93.

In the present case, like the respondent in *In re Peterson*, Wyant and his partner took advantage of trusting clients to invest over $1.5 million in his financially precarious businesses: the Firm and TLDI. Like the transactions in *Peterson*, these transactions are rife with conflicts of interest. Moreover, the conduct for which this court ordered disbarment in *Larsen* exists in this case as well. The loans were not secured, no disclosure of a conflict was ever made, and no prior written authorization was ever obtained.

The right to practice law in Minnesota requires a high level of responsibility. We find it unbelievable that an attorney of Wyant's experience would have continued to sign these guarantees with the knowledge he had of the Firm's, TLDI's, and his own financial condition. This is conduct that would be incredible for a lay person, much less an experienced attorney. We conclude that irrespective of whether Wyant's conduct constitutes criminal fraud, his conduct, as he admitted, violates Rules of Professional Conduct and Ethical Rules, thus causing unprec-

edented financial losses to clients of his firm. Thus, the appropriate sanction is disbarment.

It is so ordered.