In re Petition for DISCIPLINARY AC-
TION AGAINST Michael F. SWEN-
SEN, a Minnesota Attorney, Registra-
tion No. 216847.

No. A07–1131.

Supreme Court of Minnesota.

Nov. 15, 2007.

Opinion Modified Upon Rehearing
Jan. 1, 2008.

Michael G. Swensen, Long Lake, MN, for Respondent.

Patrick R. Burns, Office of Lawyers Professional Responsibility, St. Paul, MN, for Office Of Lawyers Professional Responsibility.

## OPINION

### PER CURIAM.

This attorney discipline case arises out of a petition filed by the Director of the Office of Lawyers Professional Responsibility against respondent Michael F. Swen-

sen, who was admitted to practice law in Minnesota on May 10, 1991. By order filed on July 23, 2007, we deemed the allegations of the petition admitted. Based on those allegations, we conclude that respondent violated Minn. R. Prof. Conduct 8.4(c) and 1.8(a) and that his misconduct warrants disbarment.

### The Mound Property

Respondent represented L.J. in various real estate transactions from 1999 to 2004. Respondent and his wife, attorney Patricia Ryerson,[1] advised L.J. to purchase an investment property located in Mound, Minnesota. Respondent and Ryerson proposed to L.J. that they would renovate the property and split the profits with her upon resale. L.J. purchased the property on May 19, 1999, for $235,000, and she later spent $63,744.11 on repairs and supplies. L.J. requested that the property be resold as initially agreed, but respondent and Ryerson repeatedly assured her that they would obtain refinancing for the property and purchase her interest. Respondent and Ryerson rented out the property beginning in September 1999, the proceeds from which were to be used to pay the mortgage. Instead, respondent and Ryerson converted the rental income to their own use.

The property was foreclosed in February 2003 and purchased by an assignee of the mortgagee at a sheriff's sale the following month. Respondent told L.J. that he and Ryerson had obtained refinancing for the property, and he and Ryerson asked her to attend a closing on September 23, 2003. It was at the September 23 closing that L.J. first learned that the property was in foreclosure, that the redemption period would expire on September 27, and that the proposed "refinanc-

---

1. A separate petition for disciplinary action was filed against Ryerson on July 17, 2007. We express no opinion here as to whether Ryerson's actions violate the rules of professional conduct.

ing" consisted of selling the property to Mark O'Brien. L.J. initially objected to the transaction, but respondent and Ryerson convinced her that the sale was the only means of avoiding loss of her entire interest upon expiration of the redemption period. L.J. sold the property to Mark O'Brien on September 26, 2003. Although the stated purchase price was $345,000, O'Brien received a $69,000 "seller's equity gift" to which L.J. neither knowingly nor willingly agreed. The September 26 sale netted $56,778.33, $45,000 of which was paid to L.J. and $11,778.33 of which was paid to VR Construction, a company belonging to Ryerson that had no legal interest in the property.

## The Minneapolis Property

Respondent and Ryerson also advised L.J. in 1999 to purchase an investment property located in Minneapolis. The two attorneys proposed that L.J. fund the purchase and renovation of the property and that they renovate the property and obtain refinancing in order to purchase L.J.'s interest. Respondent and Ryerson told L.J. that the investment would reduce her overall tax burden. L.J. purchased the property for $910,000 on September 23, 1999, and she later contributed an additional $48,000 to pay for property improvements.

Ryerson directed L.J. to sign a blank quit claim deed to the Minneapolis property in January 2000, explaining that the deed would only be filed to convey L.J.'s interest if L.J. died. Ryerson later completed the blank deed, making it appear that L.J. had conveyed to Ryerson a one-half interest in the Minneapolis property. Respondent notarized L.J.'s signature although he did not actually witness her sign the deed. The deed was recorded on November 29, 2001, without L.J.'s knowledge

or consent. Respondent and Ryerson rented out the Minneapolis property from December 1999 to January 2003, the proceeds from which were to be used to pay the mortgage.

In September 2001, respondent drafted a contract for deed conveying the Minneapolis property in its entirety from Ryerson to respondent's father for $1,200,000. The contract for deed bore the forged signature of respondent's father. Respondent and Ryerson used the contract for deed to secure a mortgage loan on the property to respondent's father, with respondent misrepresenting to the mortgagee that his father had made regular payments under the contract for deed. Although respondent's father never authorized respondent to act on his behalf in relation to the Minneapolis property, respondent signed the mortgage documents purporting to be his father's attorney-in-fact.

The second mortgagee foreclosed on the Minneapolis property in October 2002. When L.J. contacted Ryerson upon receipt of the foreclosure pleadings, Ryerson told L.J. that she and respondent had obtained refinancing and that there was no reason for concern. Respondent later informed L.J. that a buyer had been found and that her investment would be repaid out of the sale proceeds. On January 16, 2003, respondent directed L.J. to sign a quit claim deed transferring her interest in the property to Ryerson. On the same day, respondent and Ryerson conveyed the Minneapolis property by warranty deed to respondent's father, using the mortgage loan obtained with the September 2001 contract for deed to fund the purchase.[2] At closing, Ryerson received more than $955,000 as the "payoff" on the

---

2. The petition filed by the Director suggests, but does not specifically state, that the mort-

gage loan used to fund the purchase was the loan obtained with the contract for deed.

contract for deed to respondent's father. It has been deemed admitted that "the contract for deed was a sham transaction" used, together with the quit claim deeds, "to divest [L.J.] of her interest in the property." Ryerson was issued checks totaling $132,388.07 in payment for her purported interest in the September 2001 contract for deed. Although L.J. had invested more than $197,000 in the property, respondent and Ryerson paid her none of the closing proceeds but instead converted the proceeds to their own use. Ryerson subsequently directed respondent's father to sign a blank quit claim deed of the Minneapolis property, which Ryerson completed to transfer ownership of the property to Mark O'Brien, the same third party who had purchased the Mound property.

*Ensuing Litigation and Disciplinary Action*

L.J. brought an action against respondent, Ryerson, and Mark O'Brien in 2004, seeking recovery of the Mound and Minneapolis properties and damages for fraud and breach of fiduciary duties. As a result of a June 2005 settlement agreement among respondent, Ryerson, and L.J., respondent's father reconveyed the Minneapolis property to L.J.

Charges of unprofessional conduct were issued against respondent on January 22, 2007, and a panel of the Lawyers Professional Responsibility Board found probable cause for public discipline. Pursuant to the panel's direction, the Director filed a petition for disciplinary action dated May 24, 2007, and respondent admitted service of the petition on June 1. Respondent's answer was due 20 days after service of the petition under Rule 13(a), Rules on

Lawyers Professional Responsibility (RLPR). He failed to file an answer by the deadline, and the Director alleges that respondent was notified twice, once by telephone, that his answer was overdue. The Director moved for summary relief on July 20, and we granted the Director's motion, ordering that the allegations in the petition be deemed admitted. *See* Rule 13(b), RLPR. On July 31, respondent filed an answer, in which he generally denied or disclaimed knowledge of most of the allegations in the petition, and also filed a motion for extension of time to answer. The Director opposed respondent's motion. In our order of August 13, 2007, we construed respondent's motion as a motion to vacate the order for summary relief, and we denied the motion.

I.

■ An attorney against whom a petition for disciplinary action has been filed has 20 days after service of the petition to file an answer. Rule 13(a), RLPR. If the attorney fails to file an answer within the 20-day period, the allegations in the petition "shall be deemed admitted." Rule 13(b), RLPR. Respondent filed his motion to vacate and proposed answer after we had granted the Directors motion for summary relief and more than eight weeks after respondent was served with the petition. Neither respondent nor the Director cites any authority for vacating, over the objection of the Director, an order of this court deeming facts to be admitted as a result of a failure to answer in a timely manner.[3] In addition to failing to offer a credible explanation for his delay, respondents proposed answer is effectively a general denial and provides no response to the

---

**3.** This case is distinguishable from *In re Wood,* in which we granted an attorney's request to file an answer after we had ordered that the allegations in the petition be deemed admitted, because in *Wood* the Director did not oppose the attorney's request. *In re Wood,* 716 N.W.2d 341, 344 (Minn.2006).

detailed and disturbing facts alleged by the Director. Under these circumstances, we decline to vacate our order for summary relief, and we accept the facts as stated in the Directors petition as controlling.

## II.

■ Because we have ordered that the allegations in the Directors petition be deemed admitted and there is no basis for vacation of that order, the only issue before us is the appropriate discipline to impose. Respondent requests that any discipline imposed be limited to no more than a two-year suspension. The Director recommends that the respondent be disbarred. We agree with the Director.

■ The purposes of imposing discipline for attorney misconduct are the protection of the public, the protection of the judicial system, and the deterrence of future misconduct by the disciplined attorney and other attorneys. *In re De Rycke,* 707 N.W.2d 370, 373 (Minn.2006). Punishment of the attorney is not a goal of the disciplinary process. *In re Wyant,* 533 N.W.2d 397, 401 (Minn.1995). We consider four factors in determining the appropriate disciplinary sanction: " '1) the nature of the misconduct, 2) the cumulative weight of the violations of the rules of professional conduct, 3) the harm to the public, and 4) the harm to the legal profession.' " *De Rycke,* 707 N.W.2d at 373–74 (quoting *In re Oberhauser,* 679 N.W.2d 153, 159 (Minn.2004)).

Minnesota Rule of Professional Conduct 8.4(c) states that "[i]t is professional misconduct for a lawyer to * * * engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." We conclude that respondent violated Rule 8.4(c) by converting to his own use rental payments from the Mound property that were supposed to be paid toward L.J.'s mortgage, converting

sale proceeds from the Minneapolis property that were due L.J., and inducing L.J. to transfer her property interest in the Minneapolis property to Ryerson by misrepresenting to L.J. that the property was being sold and that her investment would be returned from the sale proceeds. This conduct is akin to the misappropriation of client funds, which "usually merits the sanction of disbarment unless the attorney presents clear and convincing evidence of substantial mitigating circumstances which show that the attorney did not intentionally convert the funds." *In re Swerine,* 513 N.W.2d 463, 466 (Minn.1994).

We conclude that respondent also violated Rule 8.4(c) by misrepresenting to L.J. that he and Ryerson had obtained refinancing for the Mound property, misrepresenting to the mortgagee of the Minneapolis property that his father had made payments under the contract for deed, fraudulently drafting the contract for deed for the Minneapolis property, falsely notarizing L.J.'s signature on the quit claim deed to the Minneapolis property, and signing the Minneapolis property mortgage documents as his father's attorney-in-fact without authorization to do so. *See, e.g., In re Samborski,* 644 N.W.2d 402, 407 (Minn.2002) (disbarring attorney where "[i]n addition to misappropriating client funds, [the attorney] made misrepresentations and gave false documents to clients to conceal the misappropriation"). As in *In re Graham,* in which we disbarred an attorney for misconduct that included the fabrication of documents, "[t]he nature of respondent's misconduct is rooted in dishonesty and deceit." 503 N.W.2d 476, 479 (Minn.1993).

■ We further conclude that respondent violated Minn. R. Prof. Conduct 1.8(a) by engaging in business transactions with L.J., his client, on unreasonable and undisclosed terms, without advising her in writ-

ing to seek independent legal counsel, and without obtaining her written consent to the transactions.[4] Violations of Rule 1.8(a) "merit serious disciplinary sanctions." *In re Olsen,* 487 N.W.2d 871, 874 (Minn.1992). In *Wyant,* for example, we disbarred an attorney for borrowing over $1.4 million from clients for his own benefit and for the benefit of his law firm and a corporation of which he was a part owner. 533 N.W.2d at 398, 402. The financial condition of the borrowers rendered the loans unreasonable, and the attorney failed to disclose his adverse interests, advise his clients to seek independent counsel, or obtain written consent to the conflicts of interests. *Id.* at 398–99. Moreover, in *In re Pearson* we indefinitely suspended an attorney for, *inter alia,* "entering into a business transaction with a client without disclosing conflicting and/or differing interests." 352 N.W.2d 415, 419 (Minn.1984).

Viewed in its totality, respondents misconduct is similar to that of the attorney in *In re Peterson,* 456 N.W.2d 89 (Minn. 1990). In *Peterson,* we disbarred an attorney who induced his client, a 20–year–old who had sustained serious head injuries, to lend $100,000 to the attorneys real estate company. *Id.* at 90–91, 93. The attorneys conflict of interest was not disclosed, the terms of the transaction were unreason-

able, and the attorney did not discuss the arrangements with the clients parents. *Id.* at 90. The attorney also made false representations to third parties and forged the signatures of bank officers on a document. *Id.* at 91–92. As in *Peterson,* "the nature and cumulative weight" of respondents misconduct lead us to conclude that disbarment is warranted. *Id.* at 93.[5]

We reject respondent's attempt to blame Ryerson for his wrongdoing. In *Wyant,* the attorney disclaimed responsibility for the loans his clients made to his law firm and to his corporation, blaming his business partner for the improprieties. 533 N.W.2d at 398–99. We found the attorney's "attempt to shift the blame to his partner * * * unpersuasive," emphasizing that the fact that the attorney's partner "was more directly involved in the solicitation and execution of the loans * * * does not absolve [the attorney] for his own involvement." *Id.* at 401. We noted that the attorney "was present at some point in some of the discussions * * * regarding the loans" and was aware that the terms of the loans were unfair and that the necessary disclosures had not been made. *Id.* at 398–400. Similarly, under respondent's theory, even if Ryerson is more culpable than respondent, that greater culpability does not absolve respondent of responsibil-

---

**4.** Minnesota Rule of Professional Conduct 1.8(a) provides:

> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client unless:
>
> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
>
> (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of

independent legal counsel on the transaction; and

> (3) the client gives informed consent, in a document signed by the client separate from the transaction documents, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

**5.** We recognize that client vulnerability, which was a factor in the *Peterson* analysis, is not present here. *See Peterson,* 456 N.W.2d at 90–91, 93. But this difference is not dispositive, as the absence of client vulnerability in this case does not excuse respondent's grievous misconduct.

ity for his misdeeds committed in concert with her. Even apart from his cooperation with Ryerson, however, respondent himself made misrepresentations to L.J. and to the mortgagee of the Minneapolis property, falsely notarized L.J.'s signature, and obligated his father under a mortgage without authorization. In the aggregate, respondent's violations of the rules of professional conduct clearly warrant disbarment.[6]

### III.

An attorney's "failure to answer the petition with any mitigating circumstances bars our consideration of such issues." *In re Ladd,* 463 N.W.2d 281, 283 (Minn.1990). Respondent did note at oral argument that he has never previously been subject to disciplinary action, and lack of disciplinary history can be a mitigating factor in a disciplinary proceeding. *See, e.g., In re Hanvik,* 609 N.W.2d 235, 241 (Minn.2000). But even if we were to take respondents claim into account, "lack of previous discipline alone will not mitigate severe misconduct." *In re Pugh,* 710 N.W.2d 285, 289 (Minn.2006).

Therefore, we order that respondent Michael F. Swensen be, and hereby is, disbarred.

---

**6.** We also note that many of the allegations, now deemed admitted, against respondent involve serious misconduct that is in no way dependent on the existence of an attorney-client relationship. "We have held in the past that a lawyers ethical obligations are not limited to actions occurring in the practice of law, but extend to business dealings unconnected with the practice of law." *In re Pugh,* 710 N.W.2d 285, 289 (Minn.2006).